IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RAMSEY RANDALL,

               Plaintiff,

    v.

THE COUNTY OF BERKS,
PENNSYLVANIA et al.,

           Defendant.

CIVIL ACTION
NO. 14-5091

**OPINION**

**Slomsky, J.**                                            **August 24, 2015**

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................. 3

II.    BACKGROUND .................................................................. 4

  A.   Factual Background ...................................................... 4

     1. Confinement at Berks County Jail.................................. 4

     2. Interaction with Berks County Public Defenders....................11

  B.   Plaintiff's Alleged Constitutional Violations ...................... 12

III.   STANDARD OF REVIEW ....................................................... 16

IV.   ANALYSIS .................................................................. 18

  A.   Claims Against Defendants PrimeCare and Sandra Swartley for Inadequate Medical and Mental Health Treatment........................................... 18

1.  Monell claim against PrimeCare fails because no custom or policy has been plausibly alleged by Plaintiff in the Complaint ............................................................. 19

2.  Plaintiff's claims also fail because Defendants' actions did not amount to deliberate indifference to a serious medical need ................................................... 20

B.  Claims Against the County of Berks, Pennsylvania, BCJS, and BCJS Staff for Conditions of Confinement ........................................................................................... 23

   1.  Defendant Berks County ......................................................................................... 23

   2.  Defendants BCJS and BCJS Staff ......................................................................... 24

C.  Plaintiff's Claims Against BCJS and BCJS Staff for Conditions of Confinement that Interfered with Access to Public Defenders and Legal Materials .................................... 31

   1.  Interference with access to public defenders .......................................................... 31

   2.  Interference with access to legal materials and research time ............................... 35

   3.  Failure to provide a separate box for public defender forms or have Plaintiff sign a confidentiality form ............................................................................................... 36

D.  Section 1983 Claim Against BCJS and Berks County Public Defenders for Conspiring to Violate Plaintiff's Constitutional Rights ..................................................................... 39

E.  Section 1983 Claim Against BCJS for Tampering with Non-Legal Mail ........................ 40

F.  Other Claims Against Berks County Public Defender's Office and its Employees ......... 41

V.  CONCLUSION ..................................................................................................................... 42

## I.        INTRODUCTION

Plaintiff Ramsey Randall brings this Section 1983 action against multiple Defendants from Berks County, Pennsylvania.  They include the County of Berks, Pennsylvania, the Berks County Public Defender's Office, the Berks County Jail System ("BCJS"), and PrimeCare Medical Inc. ("PrimeCare"), the healthcare contractor at BCJS.  Employees of these entities have also been sued.

Plaintiff, proceeding pro se, alleges that during his pretrial detainment at BCJS, Defendants violated his First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights. Before the Court are separate Motions to Dismiss filed by Defendants PrimeCare and Sandra Swartley, a PrimeCare medical assistant, and the County of Berks representing Berks County Public Defenders, BCJS, and employees of these entities.[1]  (Doc. Nos. 44, 45.)  For reasons that follow, the Court will grant both Motions to Dismiss.[2]

---

[1]    The complete list of Defendants is: PrimeCare, Sandra Swartley, medical assistant, the County of Berks, Pennsylvania, Berks County Public Defender's Office, Roarke T. Aston, Esq., Paul Yessler, Esq., Glenn D. Welsh, Esq., Investigator William Hanebury, BCJS, BCJS Unit Counselors, Lieutenant Miguel Castro, staff member Jessica Collins, staff member "Craig," Acting Deputy Warden Barbara Kane, Warden Janine L. Quigley, Lieutenant Jennifer Sharp, and Deputy Warden Jeffrey Smith.  (Doc. No. 11.)

[2]    In deciding these Motions, the Court has considered the following: Plaintiff's Complaint (Doc. No. 11); Defendant PrimeCare's Motion to Dismiss (Doc. No. 44); Defendant Berks County's Motion to Dismiss (Doc. No. 45); Plaintiff's Responses in Opposition to the Motions to Dismiss (Doc. Nos. 51, 52); and the arguments of Plaintiff and counsel for the Defendants at the February 17, 2015 hearing  (Mot. to Dismiss Hr'g Tr., Feb. 17, 2015.)

Before Defendants' Motions to Dismiss were filed in this case, Plaintiff filed Motions for Appointment of Counsel (Doc. Nos. 12, 13); a Motion to Compel Medical Records (Doc. No. 14); a Motion to Certify Class (Doc. No. 15); a Motion to Dismiss (Doc. No. 22); and a "Memorandum of law in request for a TRO and Preliminary Injunctions for the plaintiff and class" (Doc. No. 17).  Because the Court will grant the Motions to Dismiss (Doc. Nos. 44, 45) in their entirety, these previous motions will be denied as moot.

## II.    BACKGROUND

Plaintiff was confined at BCJS as a pretrial detainee from June 4, 2014 to approximately August 31, 2014.  During this period, he filed over twenty-five grievances.  (See Doc. No. 11.) Mostly, they concerned the conditions of his confinement, procedures at BCJS, and the medical care he received there.  The grievances and how they were handled led to the filing of the instant Complaint by Plaintiff.  In the Complaint Plaintiff also includes allegations that his attorneys at the Berks County Public Defender's Office were ineffective and engaged in certain coercive tactics that negatively affected him.  The facts, viewed in the light most favorable to Plaintiff, are set forth hereafter in more detail.

### A.    Factual Background[3]

#### 1.    Confinement at Berks County Jail

With respect to Plaintiff's confinement at BCJS, he generally alleges inadequate medical treatment, being subjected to illegal strip searches, being forced to eat meals in his cell near the toilet, being exposed to the presence of mold and flies in the showers, interference with access to counsel and legal materials, and tampering with his non-legal mail.

##### a.    Medical treatment by PrimeCare, a healthcare contractor for BCJS and Sandra Swartley, a PrimeCare medical assistant

Plaintiff brings claims relating to his medical treatment against contractor PrimeCare and medical assistant Sandra Swartley, identified in Plaintiff's Complaint as "Sandy Hawkins." Plaintiff alleges that she is in charge of the mental health department at BCJS.  (Doc. No. 11 at 58 ¶ 99.)

---

[3]   At the motion to dismiss stage, the Court must accept all well-pled facts as true.  Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).   Therefore, unless otherwise indicated, the following facts are taken from the Complaint.

On June 4, 2014, Plaintiff was committed to BCJS as a pretrial detainee.  (Doc. No. 11 at 4 ¶¶ 1-2.)  During the intake process, he met with Psychologist David Fenderman.[4]  (Id. ¶ 3.)  Together, Plaintiff and Dr. Fenderman decided that Plaintiff should resume his medication, Zoloft and Trazodone.[5]  (Id. ¶ 4.)  Plaintiff requested to be placed in medical segregation for one day to allow his body to adjust to the medication.  (Id. ¶ 5.)

Based on this request, Plaintiff was placed in administrative segregation in the jail's mental health unit.  (Doc. No. 11 at 4 ¶ 7.)  He was allowed to make one telephone call and was placed on lock down in his cell.  (Id. at 7 ¶ 14.)  Between 3:00 p.m. and 5:00 p.m., Plaintiff was given his evening medication.  (Id. ¶ 16.)  He informed the nurse that his medication was given too early, but no change in the medication schedule was made.  (Id. ¶ 17.)  Four days later, Plaintiff was moved from administrative segregation to general quarantine.  (Id. at 9 ¶ 21.)

On August 18, 2014, Plaintiff filed an inmate grievance form complaining that he had only one time a day to take his medications.  (Id. at 59 ¶ 94, Ex. C-1AH.)  Plaintiff asserted in his grievance that "the tranquilizing properties of the pill make [him] extremely vulnerable . . . ."  (Id. at Ex. C-1AH.)  He further explained that he suffers from anxiety, personality disorder, depression, insomnia with isolation tendencies, and ADD/ADHD,[6] and that there were no psychotherapy one-on-one sessions to assist him with his mental disability.  (Id.)  Ten days later, Sandra Swartley responded that his medication time could not be changed.  (Id.)

---

[4]   It is unclear from the Complaint which entity employs Dr. Fenderman.

[5]   Plaintiff does not state in his Complaint the type of medication he was prescribed.  However, in his Response to the Motion to Dismiss, Plaintiff attached information on the medications Zoloft and Trazodone.  (Doc. No. 51 at 4-5.)

[6]   ADD is an acronym for "Attention Deficit Disorder," which is now referred to as ADHD, or "Attention Deficit/Hyperactivity Disorder."  See Attention Deficit Disorder Ass'n, ADHD: The Facts, https://add.org/adhd-facts/ (last visited Aug. 17, 2015).

### b.    Conditions of Plaintiff's confinement at BCJS including strip searches, eating meals in cell, and mold and flies in showers

Plaintiff alleges that prison officials at BCJS violated his Fourth and Eighth Amendment rights by subjecting him to nude strip searches, and his Fourteenth Amendment Due Process right by requiring him to eat in his cell and shower in a stall that contained "mold and flies." These allegations are discussed in more detail below.

### i.    Strip searches

On June 13, 2014, following his preliminary hearing, Plaintiff was subjected to a nude strip search.  (Doc. No. 11 at 12 ¶ 40.)  During the strip search, Plaintiff alleges he was required to completely disrobe in front of other inmates and the supervising guard.  (Id. at 13 ¶ 41, Ex. C-1Z.)  On August 5, 2014, Plaintiff filed a grievance for being strip searched a second time upon returning from court, despite being handcuffed and shackled during the hearing.  (Id. at 41 ¶ 79.) Three days later, Plaintiff again was strip searched in the same way by a BCJS Officer upon returning from a court hearing.  (Id. at 59 ¶ 96.)

### ii.    Eating meals in cell

On July 6, 2014, Plaintiff submitted an inmate grievance form for being "required to eat meals in [his] cell within the immediate area of the toilet."  (Doc. No. 11 at 13 ¶ 51, Ex. C-1H.) He claimed in his grievance that it was unsanitary because the toilet only flushed twice per hour. (Id. at Ex. C-1H.)  Two days later, Lieutenant Jennifer Sharp, a BCJS correctional officer, responded that eating meals in the cell "is a long standing practice" and that Plaintiff may eat meals at his desk.  (Id.)

### iii.    Mold and flies in the shower

On July 20, 2014, Plaintiff filed a grievance about the presence of mold and flies in the inmate showers.  (Doc. No. 11 at 31 ¶ 67, Ex. C-1U.)   The next day, Plaintiff met with

Lieutenant Sharp to discuss this grievance.  (<u>Id.</u> at 31 ¶ 71.)  At the meeting, Lieutenant Sharp stated that the issue was not grievable.  (<u>Id.</u> at 31 ¶ 72.)  Plaintiff did not include in his Complaint any other details about this meeting.  On February 17, 2015, at the hearing on Defendants' Motions to Dismiss, Plaintiff stated that BCJS had remedied the problem of mold and flies in the inmate showers and that he consented to the voluntary dismissal of his claims based on mold and flies in the shower.  (Mot. to Dismiss Hr'g Tr. 27:24-25, 28:1-2, Feb. 17, 2015.)

### c. BCJS interference with access to public defenders and legal research material

In addition, Plaintiff alleges that BCJS interfered with his access to his public defenders by preventing use of a telephone to contact his attorney, limiting access to the law library to do legal research, and failing to provide a separate box for inmates in which to place outgoing public defender communication forms.  (Doc. No. 11 at 17 ¶¶ 53, 55-58.)  Plaintiff also alleges that BCJS and Berks County Public Defenders conspired to violate his constitutional rights by using a form that was made available to inmates as a way for them to contact their attorneys.

### i. Interference with access to public defenders

From June 4, 2014 to June 8, 2014, while Plaintiff was in administrative segregation, Plaintiff asserts that he had no contact with his public defender.  (Doc. No. 11 at 8 ¶ 22.)  Once he was moved to general quarantine, Plaintiff attempted to use the telephone three times to contact his attorney.  (<u>Id.</u> at 12 ¶¶ 30-32.)  However, during each attempt, he was unable to reach the attorney on the prison telephone because of his failure to pay a $50 processing fee.[7]  (<u>Id.</u> at Ex. C-1I.)  After the three attempts, Plaintiff attempted again on or about June 19, 2014 to call

---

[7]  The $50 processing fee is a fee that is paid in order to be eligible for financial privileges and telephone access.  <u>Inmate Accounts</u>, Cnty. of Berks, Pa., http://www.co.berks.pa.us/Dept/Jail/Pages/InmateBankingDeposittoAccount.aspx (last visited July 8, 2015).

the Public Defender's Office.  He could not get past the pin number prompt because of his failure to pay the processing fee.  (Id. at 13 ¶ 44.)  On July 4, 2014, Plaintiff submitted a request to have his "telephone privileges unfrozen."  (Id. at Ex. C-1G.)  Staff member "Craig"[8] denied Plaintiff's request because he had not paid the $50 processing fee.  (Id.)

Five days later, Plaintiff submitted a request to Deputy Warden Jeffrey Smith, a BCJS Deputy Warden, to have his telephone "privileges unfrozen." (Doc. No. 11 at Ex. C-1I.) Plaintiff's request was denied because Plaintiff did not pay the processing fee.  (Id.)  Deputy Warden Smith explained to Plaintiff  that he could submit a request for a telephone conference with his attorney or contact him by mail.  (Id.)  On July 14, 2014, Plaintiff filed an inmate grievance form complaining about the inability to contact his attorney.  (Id. at Ex. C-1M.) Lieutenant Jennifer Sharp responded that Plaintiff is "responsible for a $50 processing fee."[9] (Id.)  On August 13, 2014, Deputy Warden Barbara Kane changed the indigent inmate telephone policy to give inmates who had not paid the processing fee access to a "special services menu," which allows an inmate to contact his or her attorney.  (Id. at Ex. C-1AD.)  The same day, Plaintiff was able to contact Roarke Aston, Esquire, his public defender, on the telephone.  (Id. ¶ 88.)

### ii.    Interference with access to legal materials and research time

Plaintiff asserts that on June 11 and 12, 2014, he had insufficient access to the law library before his preliminary hearing, claiming that he only had five hours of research time to prepare.

---

[8]   Plaintiff has not provided the full name of staff member "Craig" or his specific position within BCJS.

[9]   On August 3, 2014, Plaintiff filed another grievance form alleging the same inability to contact counsel by phone.  (Doc. No. 11 at 41 ¶ 76, Ex. C-1Y.)  Deputy Warden Smith responded that Plaintiff only would be exempt from paying the fee if he was "enrolled in Act 122 as a Technical Parole Violator."  (Id. at Ex. C-1Y.)

(Doc. No. 11 at 12 ¶ 33.)  On July 14, 2014, Plaintiff filed a grievance form regarding his inability to access Third Circuit decisions in the law library.  (Id. at Ex. C-1L.)  Three days later, a response was transmitted to Plaintiff that Third Circuit access had been restored.  (Id.)

### iii. Failure to provide a separate box for public defender forms or have Plaintiff sign a confidentiality form

Lastly, Plaintiff claims that failure to maintain a separate box in which to place the forms for the public defenders constitutes breach of the attorney-client privilege.  In his Complaint, Plaintiff does not specifically describe the "public defender form."  Defendants characterize the form as an internal form than an inmate completes when requesting to schedule a meeting with his attorney.  (Doc. No. 45 at 3.)

On July 12, 2014, Plaintiff filed a grievance alleging that a separate box for outgoing public defender forms should be available to inmates.  (Doc. No. 11 at Ex. C-1K.)  On July 14, 2014, Lieutenant Miguel Castro, a BCJS correctional officer, responded that Plaintiff had to "cite a specific example of how [Plaintiff] [was] actually adversely affected . . . ."  (Id.)  On or about July 21, 2014, Plaintiff met with Lieutenant Sharp to discuss Plaintiff's grievances regarding the lack of a separate box for the forms.  (Id. at 31 ¶ 71.)  At the meeting, Lieutenant Sharp noted that this situation was not a grievable issue.  (Id.)

Plaintiff also alleges that Jessica Collins, a supervisor of all BCJS treatment staff, violated his constitutional rights by "allowing legal mail to be viewed outside the presence of the inmate" and "forcing a processing fee for calls."  (Id. at 59 ¶ 98, 75 ¶¶ 104, 108.)  Plaintiff offers no further information in the Complaint regarding Jessica Collins.

Next, Plaintiff filed a grievance form alleging that a confidentiality form was not made available for him to sign to ensure that his personal, medical, and account information were not "broadcast publicly."  (Doc. No. 11 at Ex. C-1AC.)  The grievance also noted that he had not

signed a confidentiality form allowing the jail staff to handle public defender forms.   (Id.)
Lieutenant Castro responded that Plaintiff had "no constitutional right to a confidentiality
form . . . ."   (Id.)

### d. Plaintiff's other alleged constitutional violations against BCJS including tampering with non-legal mail and attitude of staff

Although not specifically enumerated in any Count of the Complaint, Plaintiff lists
throughout the Complaint other instances of misconduct by prison staff at BCJS that he claims
violated his constitutional rights.  He asserts that BCJS staff tampered with his non-legal mail,
and used a menacing "tone" during meetings with him and when discussing his grievances.  For
example, between July 20 and 25, 2014, Plaintiff attempted to mail a mold sample from the
facility's shower to his mother.  (Doc. No. 11 at 31 ¶ 73.)  On August 7, 2014, Plaintiff received a
letter from his mother stating that she did not receive the mold sample.  (Id. at 41 ¶ 80, Ex. C-
1AA.)  In response, Plaintiff filed a grievance form because he believed that his mail had been
tampered with.  (Id. at Ex. C-1AB.)  On August 12, 2014, Plaintiff met with Lieutenant Jennifer
Sharp in her office to discuss his grievances about both mail tampering and confidentiality.  (Id.
at 49 ¶ 85.)

The next day, Plaintiff submitted a four page grievance form to Deputy Warden Jeffrey
Smith about the meeting with Lieutenant Sharp.  (Doc. No. 11 at 49 ¶ 91.)  In this grievance,
Plaintiff asserted that Lieutenant Sharp "exhibited an aggressive attitude."  (Id. at Ex. C-1AG.)
Plaintiff also asserted that his "right of being addressed respectfully by Lieutenant Sharp . . . was
not followed . . . ."  (Id.)  Deputy Warden Smith responded that Plaintiff's "continuous use of
grieving the same issue could have been interpreted as harassment."  (Id.)  That day, Plaintiff met
with Deputy Warden Smith about his grievance regarding his meeting with Lieutenant Sharp.
(Id. at 59 ¶ 93.)  It is unclear from the Complaint what was said at this meeting.

## 2.    Interaction with Berks County Public Defenders

Plaintiff also brings claims against the two Berks County Public Defenders who represented him in his state criminal case, Paul Yessler and Roarke Aston, along with the Chief Berks County Public Defender Glenn Welsh.  He also brings a claim against Investigator William Hanebury[10] of the Public Defender's Office.  His claims against these four individuals are based on the following facts.

Plaintiff alleges that on June 9 and 10, 2014, he saw Investigator William Hanebury of Berks County Public Defender's Office meeting with inmates, but that he did not meet with Plaintiff on either occasion.  (Doc. No. 11 at 9 ¶¶ 24, 26.)  On June 9, 2014, Plaintiff submitted a public defender form to communicate with his public defender.  (Id. ¶ 25.)  Thereafter, Paul Yessler was assigned to represent Plaintiff at his preliminary hearing.  (Id. at 12 ¶ 36.)

On June 13, 2014, the day of Plaintiff's preliminary hearing, Plaintiff claims he met with Yessler for five minutes before the hearing.  (Id. ¶¶ 34-35.)  He asserts that Yessler used an "aggressive tone" and "intimidating threats" to coerce him into waiving the hearing.  (Id. at ¶ 37.)  About June 19, 2014, Plaintiff filled out a second public defender form requesting to attend his arraignment in order to recant his waiver of a preliminary hearing.  (Id. at 13 ¶¶ 43-46.)  He alleges that he received no response from Yessler or the Public Defender's Office.  (Id. ¶ 47.)

On July 9, 2014, Plaintiff mailed a general complaint letter to the supervisor of Berks County Public Defender's Office for the lack of response from an attorney.  (Id. at Ex. C-1J.)  A week later, Berks County Chief Public Defender Glenn Welsh responded to Plaintiff that Roarke

---

[10] Plaintiff's Complaint spells "Hanebury" as "Hannaberry."  (Doc. No. 11 at 2.)  In their combined Motion to Dismiss, the Berks County Defendants spell the last name as "Hanebury."  (Doc. No. 45 at 3.)  For purposes of this Opinion, the Court will adopt Defendants' spelling, "Hanebury."

Aston was now assigned to represent him.  (Id. at Ex. C-1R.)  After receiving the letter, Plaintiff mailed a formal complaint to the Pennsylvania and Berks County Bar Associations, asserting that the quality of the representation violated his Sixth and Fourteenth Amendment rights.  (Id. at Ex. C-1S.)

On July 22, 2014, Plaintiff filed another public defender form requesting an immediate bench trial after he had an "unpleasant video conference" with Aston.  (Doc. No. 11 at 31 ¶ 68, Ex. C-1V.)  On July 30, 2014, Plaintiff used another public defender form requesting that Aston file a pretrial motion on his behalf and send him his pretrial discovery.  (Id. at 11 ¶ 74.)  On August 11, 2014, Plaintiff had a second video conference with Aston.  (Id. at 41 ¶ 82.)  The conversation focused on Plaintiff's use of public defender forms to contact counsel.  (Id.)  Plaintiff asserts that Aston "admitted during the video conference that he was aware" the use of the "[public defender] form was against the Rules and Constitution."[11] (Id. ¶ 83.)  He further alleges that Aston informed him during this meeting that he had "no defense" for his case.  (Id. ¶ 84.)

**B.    Plaintiff's Alleged Constitutional Violations**

Based on the foregoing events, Plaintiff filed this civil rights lawsuit against PrimeCare, the County of Berks, Pennsylvania, Berks County Public Defenders, BCJS, and certain

---

[11] Plaintiff does not state why he believed the form was unconstitutional.  Plaintiff also fails to specify what "Rules" he is referring to in this conversation.

employees of each entity.  Liberally construed, the Complaint (Doc. No. 11) can be separated into the following claims:[12]

1.   Counts I & II—42 U.S.C. § 1983, against PrimeCare and medical assistant Sandra Swartley (identified in Plaintiff's Complaint as Sandy Hawkins) for deliberate indifference to Plaintiff's serious medical needs by "serving his medication at inappropriate times and not providing mental health services" in violation of the Eighth Amendment.[13]

2.   Count III—42 U.S.C. § 1983, against the County of Berks for the policy, practice, and/or custom of performing strip searches on inmates, having inmates eat in their cells, exposing them to mold and flies in the showers, denying telephone privileges if the inmate did not pay the $50 processing fee, giving limited access to the law library, and not providing a separate box for public defender forms, all in violation of the First, Fourth, Sixth, Eighth and Fourteenth Amendments.

3.   Count IV—42 U.S.C. § 1983, against BCJS for the policy, practice, and/or custom of performing strip searches on inmates, having inmates eat in their cells, exposing inmates to mold and flies in the showers, denying telephone privileges if the inmate did not pay the $50 processing fee, giving limited access to the law library, and not providing a separate box for

---

[12]  A handwritten summary of Plaintiff's Claims is found in the second part of his Complaint. (Doc. No. 11 at 74.)  The Complaint is disjointed and the Court has attempted to construe it as best as is possible in the light most favorable to Plaintiff.  Although Plaintiff did not specify that his constitutional claims are brought pursuant to 42 U.S.C. § 1983, the Court will analyze them under this statute.  See Johnson v. City of Shelby, 135 S. Ct. 346 (2014) (complaint did not need to expressly invoke Section 1983).

[13]  Because Plaintiff was a pretrial detainee at BJCS during the time giving rise to his claims, the Eighth Amendment protection against cruel and unusual punishment does not apply to his claims.  Rather, Plaintiff should have brought these clams as Fourteenth Amendment Due Process claims.  See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983); Hubbard v. Taylor, 399 F.3d 150, 164 (3d. Cir. 2005).  For reasons discussed infra in Section VI.A, the Court will analyze Plaintiff's Eighth Amendment claims against Sandra Swartley as if they were brought under the Due Process Clause of the Fourteenth Amendment.

public defender forms, all in violation of the First, Fourth, Sixth, Eighth and Fourteenth Amendments.

4.   Count V—42 U.S.C. § 1983, against Lieutenant Miguel Castro in his individual and official capacities[14] for failing to have Plaintiff sign a confidentiality form and "allowing legal mail to be viewed outside the presence of the inmate" in violation of the First, Fourth and Sixth Amendments.

5.   Count VI—42 U.S.C. § 1983, against Jessica Collins, who Plaintiff alleges is "head of all treatment staff," in her individual and official capacities for "allowing legal mail to be viewed outside the presence of the inmate" and for "forcing a processing fee for calls" in violation of the First, Fourth, Sixth, and Fourteenth Amendments.

6.   Count VII—42 U.S.C. § 1983, against staff member "Craig" in his official and individual capacities for "not permitting unmonitored phone calls to [inmates'] attorneys when indigent [sic]" in violation of the First Amendment.

7.   Count VIII—42 U.S.C. § 1983, against Acting Deputy Warden Barbara Kane in her official and individual capacities for "not permitting unmonitored phone calls to [inmates'] attorneys when indigent [sic]" and for "allowing legal mail to be viewed outside the presence of the inmate" in violation of the First, Fourth, and Fourteenth Amendments.

8.   Count IX—42 U.S.C. § 1983, against Warden Janine Quigley in her official and

---

[14] Liberally construing Plaintiff's Complaint, the Court will assume that he is suing each official in both his or her official and individual capacities.  A plaintiff may sue a state official in his or her individual capacity for damages.  <u>Hafer v. Melo</u>, 502 U.S. 21, 30-31 (1991).  Alternatively, to be considered a "person" under § 1983, a person sued in his or her official capacity may only be sued for injunctive relief.  <u>Id.</u> at 26.  Plaintiff has not specifically pled in what capacity he is suing each BCJS employee, but seeks both injunctive relief and monetary damages against these officers.  (Doc. No. 11 at 77 ¶¶ 113-26.)

individual capacities for negligence in failing to remedy the prison's practice of having inmates eat in their cells, for "allowing legal mail to be viewed outside the presence the inmate," for "not permitting unmonitored phone calls to [inmates'] attorneys when indigent," and "forcing a processing fee for calls" in violation of the First Amendment and the Due Process Clause of the Fourteenth Amendment.

9.   Count X—42 U.S.C. § 1983, against Lieutenant Jennifer Sharp in her official and individual capacities for negligence in failing to remedy the prison's practice of having inmates eat in their cells, exposing them to mold and flies in the shower,[15] "not permitting unmonitored phone calls to [inmates'] attorneys when indigent [sic]," "allowing legal mail to be viewed outside the presence of the inmate," and "forcing a processing fee for calls" in violation of the First, Fourth, Eighth, and Fourteenth Amendments.

10.   Count XI—42 U.S.C. § 1983, against Deputy Warden Jeffery Smith in his official and individual capacities for "allowing legal mail to be viewed outside the presence of the inmate," "not permitting unmonitored phone calls to [inmates'] attorneys when indigent [sic]," and "forcing a processing fee for calls" in violation of the First Amendment.

11.   Count XII—42 U.S.C. § 1983, against Berks County Public Defenders and BCJS for conspiring to violate Plaintiff's First, Fourth, Sixth, and Fourteenth Amendment rights.

12.   Count XIII to XVII—42 U.S.C. § 1983, against Berks County Public Defenders Roarke T. Aston, Esquire, Glenn D. Welsh, Esquire, Paul Yessler, Esquire, and Investigator William Hanebury respectively and in their official and individual capacities for ineffective assistance of counsel through Plaintiff's pretrial proceedings, for "allowing legal mail to be

---

[15]   As noted above, at the hearing held in this case, Plaintiff agreed that the exposure to mold and flies in the shower had been remedied and that he is no longer pursuing this claim.  (Mot. to Dismiss Hr'g Tr. 28:3-5; 27:24-25, Feb. 17, 2015.)

viewed outside the presence of the inmate," and for "using the public defender form" in violation of the First, Fourth, Sixth and Fourteenth Amendments.

As noted previously, before the Court are Defendants' PrimeCare[16] and the County of Berks, Pennsylvania[17] Motions to Dismiss all counts pursuant to Federal Rule of Civil Procedure 12(b)(6). The Motions to Dismiss will be granted in their entirety for reasons that follow.

## III.   STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009). After Iqbal it is clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. Id. at 663; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ethypharm S.A. France v. Abbott Labs., 707 F.3d 223, 231 n.14 (3d Cir. 2013) (citing Sheridan v. NGK Metals Corp., 609 F.3d 239, 262 n.27 (3d Cir. 2010)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster Twp., 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a 12(b)(6) motion to dismiss:

---

[16] PrimeCare also moves to dismiss on behalf of medical assistant Sandra Swartley.

[17] County of Berks, Pennsylvania moves to dismiss the Complaint on behalf of itself and the Berks County Public Defenders, Roarke T. Aston, Paul Yessler, Glenn D. Welsh, Investigator William Hanebury, BCJS, BCJS Unit Counselors, Lieutenant Miguel Castro, staff member Jessica Collins, staff member "Craig," Acting Deputy Warden Barbara Kane, Warden Janine Quigley, Lieutenant Jennifer Sharp, and Deputy Warden Jeffrey Smith.

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679).  "This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged."  Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts.  Fowler, 578 F.3d at 210-11 (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679.  The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.

Where, as here, the complaint is filed pro se, the "complaint, 'however inartfully pleaded' must be held to 'less stringent standards than formal pleadings drafted by lawyers.'"  Fatone v. Latini, 780 F.3d 184, 193 (3d Cir. 2015) (quoting Haines v. Kerner, 404 U.S. 519, 520-21 (1972)).  It should be dismissed only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of [his] claim that would entitle [him] to relief."  Olaniyi v. Alexa Cab Co., 239 F. App'x 698, 699 (3d Cir. 2007) (citing McDowell v. Del. State Police, 88 F.3d 188, 189 (3d Cir. 1996)).  Nevertheless, even pro se plaintiffs must comply with the Federal Rules of Civil Procedure when drafting a complaint.

**IV.    ANALYSIS**

As mentioned above, Plaintiff asserts claims against Defendants PrimeCare, the County of Berks, Pennsylvania, BCJS, Berks County Public Defender's Office, and certain employees of each entity in violation of his First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983.  Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory. . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

To establish a claim under Section 1983, a plaintiff must demonstrate a violation of a right protected by the Constitution or the laws of the United States that was committed by a person acting under color of state law.  Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000).  The Court will address each claim seriatim.

**A.    Claims Against Defendants PrimeCare and Sandra Swartley for Inadequate Medical and Mental Health Treatment**

In Counts I and II, Plaintiff brings claims against PrimeCare and PrimeCare Medical assistant Sandra Swartley for inadequate medical and mental health treatment in violation of the Eighth Amendment.   Plaintiff's Complaint alleged, and Defendants' Motion to Dismiss discussed, the claims for inadequate medical care as arising under the Eighth Amendment right of a convicted prisoner to receive adequate medical care.  Estelle v. Gamble, 429 U.S. 97, 104-05 (1976).  However, the Eighth Amendment is inapplicable to Plaintiff because he was a pretrial detainee during his confinement at Berks County Jail.

The Eighth Amendment's Cruel and Unusual Punishments clause does not apply until after a detainee is convicted and sentenced.  Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2012).  Rather, because "[p]retrial detainees have a liberty interest in being free from punishment prior

to conviction under the Due Process Clause," a pretrial detainee must challenge any conditions of confinement, including inadequate medical care, under the Fourteenth Amendment. Sykes v. Carroll, No. 06-072, 2011 WL 5826054, at *5 (D. Del. Nov. 18, 2011) aff'd 477 F. App'x 861 (3d Cir. 2012).

Plaintiff's failure to specifically plead Fourteenth Amendment Due Process violations for Counts I and II is immaterial, because the "Fourteenth Amendment affords pretrial detainees protections at least as great as the Eighth Amendment protection available to a convicted prisoner . . . ." Sylvester v. City of Newark, 120 F. App'x 419, 423 (3d Cir. 2005) (quoting Natale v. Camden Cnty. Corr. Fac., 318 F.3d 575, 581 (3d Cir. 2003)) (internal quotation marks omitted). Accordingly, the Third Circuit applies the familiar Eighth Amendment standard set forth in Estelle v. Gamble, 429 U.S. 97 (1976), when evaluating a claim for inadequate medical care of a pretrial detainee under the Fourteenth Amendment. Sylvester, 120 F. App'x at 423; see also Williams v. Guard Bryant Fields, 535 F. App'x 205, 210 n.4 (3d Cir. 2013).

1.     **Monell claim against PrimeCare fails because no custom or policy has been plausibly alleged by Plaintiff in the Complaint**

As a preliminary matter, Plaintiff fails to allege a plausible claim against PrimeCare as a private corporation acting under color of state law. PrimeCare is a private corporation that contracted with BCJS to provide medical care to inmates. The analysis of a Section 1983 claim against a private entity is the same for a Section 1983 claim against a municipality under Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). Accordingly, "[a] private corporation contracted by a prison to provide health care for inmates cannot be held liable on a respondeat superior theory; rather, it can only be held liable for constitutional violations if it has a custom or policy exhibiting deliberate indifference to a prisoner's serious medical needs." Henry v.

Buskirk, Civ. A. No. 08-1348, 2011 WL 767540, at *4 (E.D. Pa. Feb. 24, 2011) (citing Natale, 318 F.3d at 583-84) (footnotes omitted).

Not all state action rises to the level of a custom or policy for Monell purposes.  A policy is made "when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy, or edict."  Kneipp v. Tedder, 95 F.3d 1199, 1212 (3d Cir. 1996) (internal quotation marks omitted).  A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law."  Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997).

In the Complaint, Plaintiff has not alleged any facts that identify or describe a policy or custom established by PrimeCare that caused his alleged constitutional violations.  Plaintiff has merely alleged that he would prefer to take his medication later in the day, and that he would like to have one-on-one psychotherapy sessions.  No policy or custom is alleged.  Accordingly, for this reason alone, PrimeCare's Motion to Dismiss Counts I and II should be granted.  See Dade v. Gaudenzia DRC, Inc., Civ. A. No. 13-1381, 2013 WL 3380592, at *4 (E.D. Pa. July 8, 2013) (granting defendant's motion to dismiss and reasoning that plaintiff had failed to identify an applicable policy or custom that caused his deprivation of psychological treatment).

> **2.    Plaintiff's claims also fail because Defendants' actions did not amount to deliberate indifference to a serious medical need**

Plaintiff's claims against both PrimeCare and Sandra Swartley[18] fail because Plaintiff cannot establish deliberate indifference to a serious medical need.  In order to state a claim under the Eighth or Fourteenth Amendment, Plaintiff must plausibly allege that (1) he had a serious medical need; and (2) prison medical staff employed by PrimeCare were deliberately indifferent to that need.  Estelle, 429 U.S. at 106; Boring v. Kozakiewicz, 833 F.2d 468, 473 (3d Cir. 1987).

---

[18] Plaintiff has not alleged any specific conduct on the part of Sandra Swartley other than naming her as a Defendant and attaching to the Complaint her response to his grievance.

### a.    Serious medical need

First, Plaintiff has failed to plausibly allege that his mental health needs were serious medical needs.  A medical need is serious if it "has been diagnosed by a physician as requiring treatment or if it is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  Atkinson v. Taylor, 316 F.3d 257, 272-73 (3d Cir. 2003) (internal quotation marks omitted).  To constitute a serious medical need, the condition must be such that "a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death."  Tsakonas v. Cicchi, 308 F. App'x 628, 632 (3d Cir. 2009) (internal quotation marks omitted).

Plaintiff fails to describe in his Complaint exactly what his mental health needs were, much less the specifics or severity of them.  Although he was apparently given medication for his mental health issue, which he complains he had to take earlier in the day than was needed, he does not allege any specific suffering, injury, possibility of suicide, or death from taking his medication earlier than he preferred.  See, e.g., Hanrahan v. Menon, Civ. A. No. 9:07-CV-610, 2010 WL 6427650, at *8 (N.D.N.Y. Dec. 15, 2010) (concluding that depression and anxiety paired with suicidal attempts created an issue of material fact as to whether the plaintiff was suffering from a serious medical condition (emphasis added)).

### b.    Deliberate indifference

Second, Plaintiff has not demonstrated deliberate indifference on the part of PrimeCare or Sandra Swartley to his medical or mental health needs.  Claims of mere negligence in "diagnosing or treating a medical condition does not state a valid claim of medical mistreatment . . . ."  Estelle, 429 U.S. at 106.  Further, matters of medical judgment and medical malpractice do not state a claim for relief.  Id. at 107.  Specifically, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims

which sound in state tort law." <u>United States ex rel. Walker v. Fayette Cnty.</u>, 599 F.2d 573, 575 n.2 (3d Cir. 1979) (internal quotation marks omitted).

Here, Plaintiff avers that he would prefer administration of his medication later in the day because "the tranquilizing properties of the pill make [him] extremely vulnerable . . . ." (Doc. No. 11 at Ex. C-1AH.) He also asserts that he would prefer psychological one-on-one visits. (<u>Id.</u> at 59 ¶ 94.)

Plaintiff provides no information showing how his medical needs were untreated. Although his medication was given to him earlier in the day than he preferred, Plaintiff still received his medication after consultation with medical staff. (Doc. No. 11 at 7 ¶¶ 16-17.) Plaintiff also met with a BCJS Psychologist David Fenderman upon entering BCJS.

Consequently, because Plaintiff was treated, his claims only evince disagreement with the professional judgment of the medical staff regarding the time of day he was given medication and the level of psychological care he should receive. It is well-settled that mere disagreement with the professional judgment of medical staff does not establish a constitutional violation. <u>Spruill v. Gillis</u>, 372 F.3d 218, 235 (3d Cir. 2004). Further, courts have held that an inmate's dissatisfaction with the time of day the medical staff distributes medicine constitutes second-guessing of professional judgment, and does not rise to the level of a cognizable constitutional claim. <u>See</u> <u>Mincy v. Deparlos</u>, 497 F. App'x 234, 241 (3d Cir. 2012) (concluding that a refusal to provide an alternative time to take medication did not rise to the level of a violation of inmate's federally-protected rights); <u>Jackson v. City of Phila.</u>, Civ. A. No. 2:10-cv-00457, 2012 WL 2135506, at *11 (E.D. Pa. June 13, 2012) (concluding that "[t]he mere fact that an inmate may not have received treatment as quickly as he would have liked, or in the manner he would have preferred does not serve to show a constitutional violation"); <u>Carter v. Taylor</u>, 557 F. Supp. 2d

469, 476 (D. Del. 2008) (stating that disagreement with the time of treatment did not give rise to a Section 1983 claim).

Accordingly, because Plaintiff has failed to establish deliberate indifference to a serious medical need by PrimeCare and Swartley, and a plausible <u>Monell</u> claim against PrimeCare, the Motion to Dismiss Plaintiffs' Fourteenth Amendment claims against these two Defendants will be granted.

### B.   Claims Against the County of Berks, Pennsylvania, BCJS, and BCJS Staff for Conditions of Confinement

In Counts III , IV, and X of the Complaint, Plaintiff alleges claims against the County of Berks, Pennsylvania, BCJS, and BCJS employees for violations of his constitutional rights regarding the conditions of confinement in BCJS.  First, Plaintiff brings a claim under the Fourth and Eighth Amendments for being subjected to strip searches after court proceedings in the presence of other inmates.  Second, he brings Fourteenth Amendment Due Process claims for being forced to eat meals in his cell and for being exposed to mold and flies in the shower.

### 1.   Defendant Berks County

Plaintiff brings claims against the County of Berks, Pennsylvania for all alleged constitutional violations committed by BCJS and its employees as the overseeing body of the prison.  However, as previously discussed, "a municipality cannot be held liable under [Section] 1983 on a <u>respondeat superior</u> theory."  <u>Monell</u>, 436 U.S. at 691.  Thus, as a municipality, the County of Berks cannot be held liable for the actions of the employees of BCJS.  Rather, "it is when execution of a government's policy or custom . . . may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under [Section] 1983."  <u>Id.</u> at 694.

In the body of his Complaint, Plaintiff does not identify any policy or custom employed by Berks County to support a <u>Monell</u> claim.  Even if Plaintiff could make such a showing, his claim would still fail because, as discussed below, Plaintiff cannot show a violation of any of his constitutional rights by implementation of the policy or custom.  See <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986) (concluding that even when departmental regulations may have authorized an action, there are no damages awarded for actions that inflict no constitutional harm); <u>Bergdoll v. City of York</u>, 515 F. App'x 165, 171 (3d Cir. 2013) (explaining that even if a policy or custom is shown, <u>Monell</u> liability will still fail when no violation of a plaintiff's constitutional rights is shown).

### 2.   Defendants BCJS and BCJS Staff

#### a.   Strip searches

Plaintiff alleges that BCJS's policy of strip searching inmates after court proceedings in front of other inmates violates the Fourth and Eighth Amendments.  As a preliminary matter, Plaintiff's Eighth Amendment claim will be assumed to be pled under the Fourteenth Amendment Due Process clause because Plaintiff is a pretrial detainee.  <u>Hubbard v. Taylor</u>, 399 F.3d 150, 157-58 (3d. Cir. 2005).

##### i.   Standard under the Fourth and Fourteenth Amendments

With respect to Plaintiff's claims that strip searches violate his Fourth Amendment Due Process rights, a plaintiff must show that the strip search was punitive in nature.  <u>Stevenson v. Carroll</u>, 495 F.3d 62, 67 (3d Cir. 2007) (citing <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979)).  In making this determination, a court must first determine whether there is a "reasonable relationship" between the challenged practice and a legitimate governmental objective.  <u>Id.</u>  In the absence of "expressed intent to punish," the "reasonable relationship" determination

"generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it."[19] Id.

There are subjective and objective elements of unconstitutional punishment the court must consider alongside the "reasonable relationship" test.  Id.  Objectively, the deprivation must be "sufficiently serious" and subjectively, government officials must act "with a sufficiently culpable state of mind."  Id.  (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  In weighing subjective and objective elements, the court can permit an inference of culpable mens rea "where the restriction is arbitrary or purposeless, or where the restriction is excessive, even if it would accomplish a legitimate governmental objective."  Id.  (citing Bell, 441 U.S. at 538-39 & n.20).

This kind of analysis also applies to Plaintiff's Fourth Amendment claim regarding his strip searches.  Even absent probable cause, a strip search of a pretrial detainee does not violate the Fourth Amendment provided that the search is not unreasonable.  Bell, 441 U.S. at 558; see also Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington, 132 S.Ct. 1510, 1518-20

---

[19]  The court in Stevenson also listed the following factors that courts "might use as guideposts in distinguishing restrictions that are punitive from those that are not."  Stevenson, 495 F.3d 62, 67 (3d Cir. 2007).  They are:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected it assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry . . . .

Id.

In this case, because there is no evidence of culpable mens rea by prison officials, routine strip searches are reasonably related to legitimate prison safety, and the strip searches complained about here are not excessive in light of the fact that Plaintiff was returning from a hearing, only a limited number of the guideposts are relevant in considering Plaintiff's claims.

(2012) (holding that deference must be given to prison officials, there is no basis for the assertion that some prisoners should be exempt, and that strip searches do not violate the Fourth and Fourteenth Amendments).  The test of reasonableness "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails."  Bell, 441 U.S. at 558.  "Courts must consider the scope of that particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."  Id.

### ii. Plaintiff's strip searches were not in violation of the Fourth and Fourteenth Amendments

Plaintiff fails to plausibly allege in the Complaint that the circumstances regarding his strip searches were (1) unreasonable in violation of the Fourth Amendment; and (2) punitive in violation of Fourteenth Amendment due process.[20]

Many courts have declined to find constitutional violations for routine strip searches of pretrial detainees.  Most notably, the Supreme Court in Bell v. Wolfish held that an institution's strip searches of pretrial detainees after a contact visit with a person from outside the institution did not violate the Fourth Amendment.  Id.  The court found that strip searches in general were not unreasonable under the Fourth Amendment because of the strong governmental justification, namely safety in correctional facilities, for the invasion of privacy.  It noted:

---

[20] Plaintiff's Fourteenth Amendment Due Process claim is made under the substantive due process prong of that Amendment.  "The Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them."  Leamer v. Fauver, 288 F.3d 532, 546 (3d Cir. 2002) (quoting Foucha v. Lousiana, 504 U.S. 71, 80 (2002)) (internal quotation mrks omitted).  "Unlike sentenced prisoners, who . . . must look to state law for the protection of their personal liberties, pretrial detainees have liberty interests firmly grounded in federal constitutional law."  Bistrian v. Levi, 686 F. 3d 352, 372-73 (3d Cir. 2012) (quoting Cobb v. Aytch, 642 F.2d 946, 962 (3d Cir. 1981)).  As such, substantive due process under the Fourteenth Amendment protects a pretrial detainee's liberty interest to be free from conditions of confinement that amount to "punishment" of the detainee.  See Bell v. Wolfish, 441 U.S. 520, 535-37 (1979).

> A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence.  And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record, and in other cases.

Bell, 441 U.S. at 559.

Here, Plaintiff's strip search was reasonable under the Fourth Amendment because he had just returned from a court hearing, which is akin to a contact visit that necessitated strip searches in Bell.  See Collazo v. Cnty. of Lancaster, Civ. A. No. 10-07010, 2012 WL 3777440, at *9 (E.D. Pa. Aug. 31, 2012) ("The United States Supreme Court's decision in Bell upholding inmate strip searches would also apply to . . . strip search[es] after returning from court, because at that point, plaintiff was returning from 'a contact visit with a person from outside the institution.'" (quoting Bell, 441 U.S. at 557)).

Moreover, it was not unreasonable to strip search Plaintiff in the presence of other inmates.  Strip searches in the presence of other inmates are not unreasonable in light of legitimate time constraints and safety concerns for correctional officers when inmates are returning to the facility after a contact visit.  See DiFilippo v. Vaughn, No. 95-909, 1996 WL 355336, at *2 (E.D. Pa. June 24, 1996); see also Elliot v. Lynn, 38 F.3d 188, 192 (5th Cir. 1994) (explaining that although a prisoner's privacy may be compromised, a strip search in the presence of other inmates was reasonable considering time constraints and security concerns).

Turning to his due process argument, Plaintiff's strip search claim, even when viewed in the light most favorable to him, does not make out a violation of Fourteenth Amendment Due Process.  First, there is a legitimate prison safety objective for conducting routine strip searches. "Ensuring security and order at the institution is a permissible and nonpunitive objective, whether the facility houses pretrial detainees, convicted inmates, or both."  Bell, 441 U.S. at 561.

Second, routine strip searches have been found to be reasonably related to a prison's legitimate safety goals.  In light of the legitimate safety concern, the Court in <u>Bell</u> held that the the strip searches did not violate due process because there was no evidence that the challenged practices, including strip searches, were excessive or exaggerated responses to those legitimate security needs.  <u>Id.</u>

Lastly, in analyzing the "objective factors," there is no evidence in the manner or duration of the strip search to suggest that it went beyond a routine safety search.  It was not a "sufficiently serious" intrusion.   In the Complaint, Plaintiff simply alleged that he was "strip searched as a return detainee after being handcuffed and shackled throughout the entire hearing process."   (Doc. No. 11 ¶ 79.)   Plaintiff attached to the Complaint a corresponding inmate grievance regarding the strip search in which he stated:

> After going to court and being handcuffed and monitored by Berks County Police prior to my hearing all day. [sic]  I do not understand why I have to be subject to a strip search? [sic]  It doesn't make sense to me because I see no way of me bringing in contraband when I am cuffed throughout the entire time and constantly monitored by police.  Please Explain.

(<u>Id.</u> at Ex. C-1Z.)  The allegations in the Complaint and the grievance do not set forth any circumstances that indicate that this particular strip search was anything more than a non-arbitrary, routine search after a contact visit, the type of strip search that was found constitutional in <u>Bell</u>.  Even when handcuffed, an inmate may still have access to contraband.

Turning to the "subjective" factors, Plaintiff has failed to set forth any facts that would indicate a culpable state of mind on the part of prison staff.  There is no evidence that strip searches were excessive or exaggerated or executed with an intent to punish Plaintiff.  Without such facts, the strip searches cannot be held to be punitive in contravention of Fourteenth Amendment.  <u>See</u> <u>DiFillipo</u>, 1996 WL 355336, at *3 ("Here, plaintiff does not allege that the

[strip] search was conducted for an illegitimate or unjustified purpose, <u>nor does he allege that</u> <u>that [the correctional officer] executed the search in an inappropriate or abusive manner</u>." (emphasis added)).

Thus, accepting Plaintiff's allegations as true and drawing all reasonable inferences from them in the light most favorable to Plaintiff, he has not shown any facts which would support his claim that the strip searches were unreasonable or punitive in nature.  Thus, in regard to this claim, no violations of unconstitutional rights are plausibly alleged in the Complaint.

**b.    Eating meals near toilet in cell**

Plaintiff brings claims under the Fourteenth Amendment against BCJS, Warden Janine Quigley, and Lieutenant Jennifer Sharp for being forced to eat meals in his cell near a toilet.

The same Fourteenth Amendment substantive due process analysis that applied to Plaintiff' strip searches applies equally to Plaintiff's claim for having to eat meals near the toilet in his cell: the Court must determine whether the condition was "punitive" in nature by inquiring as to whether any legitimate purpose is served by the condition, and whether the condition was rationally related to that purpose.  <u>Hubbard v. Taylor</u>, 399 F.3d 150, 157-58 (quoting <u>Union Cnty.</u> <u>Jail Inmates v. DiBuono</u>, 713 F.2d 984, 992 (3d Cir. 1983)).

In a case involving the identical claim regarding eating meals in a Berks County Jail cell, a court in this district held, "[w]hether Berks County Jail System serves meals to pretrial detainees in their cells due to limited space in dining areas or for security reasons, the practice serves a legitimate purpose."  <u>Mestre v. Wagner</u>, Civ. A. No. 11-2191, 2012 WL 299652, at \*4 (E.D. Pa. Feb. 1, 2012).  Indeed, both "[m]anaging overcrowding and maintaining security are legitimate purposes."  <u>Id.</u> (internal citations omitted).  Thus, "[s]erving [Plaintiff] meals in his cell was rationally related to—and not excessive when viewed in the light of—either purpose." <u>Id.</u>

Plaintiff has not alleged that being forced to eat meals in his cell was punitive or not necessary to the security and management of Berks County Jail.  He merely alleges that eating in his cell is unsanitary because he must eat near the toilet.  (Doc. No. 11 at Ex. C-1H.)  Like BCJS's legitimate purposes in Mestre, here too the jail must manage overcrowding and maintain security.  Based on the foregoing, serving a pretrial detainee meals in a cell that can be eaten at his desk, even if the cell has a toilet, does not violate the Due Process Clause of the Fourteenth Amendment.

With respect to defendants Warden Quigley and Lieutenant Sharp, Plaintiff does not allege that these individuals had any personal involvement in requiring him to eat in his cell near the toilet.  Plaintiff simply alleges that both Defendants responded to his grievances and failed to remedy the issue.  (Doc. No. 11 at Ex. C-1H.)  Because serving a pretrial detainee meals in his cell does not amount to a constitutional violation, and because there is no claim that these two prison officials had personal involvement in the alleged violation, there is no basis for any cause of action against them.

### c.    Mold and flies in showers

Regarding the presence of mold and flies in the inmate showers, Plaintiff stated during the hearing on Defendants' Motions to Dismiss that he no longer wished to proceed on this cause of action, explaining that BCJS remedied the situation.  (Mot. to Dismiss Hr'g Tr. 28:3-5; 27:24-25, Feb. 17, 2015.)  Therefore, the Court will dismiss this claim as moot.[21]

---

[21]  Even if Plaintiff had proceeded on this claim, his allegation would not be sustainable. Plaintiff's claim would fail because the presence mold in a shower is not sufficiently serious and Plaintiff has not alleged that the mold posed a risk to his health.  See Williams v. Meisel, No. 13-4926, 2014 WL 4744561, at *4 (E.D. Pa. Sept. 24, 2014) (finding that mold in showers did not amount to a constitutional violation because the mold did not expose inmates to an unreasonable risk of serious damage to future health).  Plaintiff's claim would also fail because BCJS and its staff have remedied the mold and therefore there was no deliberate indifference to inmate health and safety.

C.   **Plaintiff's Claims Against BCJS and BCJS Staff for Conditions of Confinement that Interfered with Access to Public Defenders and Legal Materials**

In Counts III through XI, Plaintiff brings claims against Berks County,[22] members of BCJS staff, staff member "Craig," Acting Deputy Warden Barbara Kane, Lieutenant Jennifer Sharp, and Deputy Warden Jeffrey Smith for interference with access to public defenders and legal research materials.  Where a plaintiff contests his access to counsel as a pretrial detainee, the court must consider whether the challenged prison conduct "unjustifiably obstruct[s] the availability of professional representation or other aspects of the right of access to the courts" in light of "the central objective of prison administration, [and] safeguarding institutional security." Procunier v. Martinez, 416 U.S. 396, 419 (1974), overruled on other grounds by Thornborough v. Abbot, 490 U.S. 401 (1989)).  The right to access to counsel is included in the right to access the courts.  Benjamin v. Fraser, 264 F.3d 175, 186-87 (2d Cir. 2001).

However, a pretrial detainee "making an access to courts claim is required to show that the denial of access caused actual injury."  Tinsley v. Giorla, 369 F. App'x 378, 381 (3d Cir. 2010) (citing Lewis v. Casey, 518 U.S. 343, 352-54 (1996)).  "Actual injury occurs when a [pretrial detainee] demonstrates that a 'nonfrivolous' and 'arguable' claim was lost because of the denial of access to the courts.  Id.  (citing Christopher v. Harbury, 536 U.S. 403, 415 (2002)).

1.   **Interference with access to public defenders**

Plaintiff alleges that BCJS, staff member "Craig," Acting Deputy Warden Kane, Lieutenant Sharp, and Deputy Warden Smith violated his First, Sixth, and Fourteenth Amendment rights by denying him communication with his attorney while he was in administrative segregation and "not permitting unmonitored phone calls to [inmates'] attorneys

---

[22]  For the same reasons discussed in section B.1 infra, Plaintiff has failed to state a Monell claim against Berks County.

when indigent." In this regard, Plaintiff first alleges he had no access to Berks County Public Defenders during the four days he was in administrative segregation. (Doc. No. 11 at 7 ¶ 22.) Second, Plaintiff alleges that from June 10, 2014 to August 13, 2014 he was denied telephone access to contact his attorney because he is indigent and did not pay his $50. (Doc. No. 11 at Ex. C-1G.)

### a.    Access to public defender during administrative segregation

An inmate's confinement in administrative segregation does not suspend his or her right to meaningful access to the courts. Allah v. Seiverling, 229 F.3d 220, 224 (3d Cir. 2000). However, Plaintiff's claim fails because he does not show how his inability to contact his attorney while on segregation caused him actual injury.

Upon intake, Plaintiff was placed in administrative segregation from June 4 to June 8, 2014. Plaintiff's next in-court appearance was at his preliminary hearing on June 13, 2014. In his Complaint, however, Plaintiff states that he had five hours of personal research time in the law library and met with and discussed his case with counsel before the preliminary hearing. Although Plaintiff claims that the research time and meeting with counsel were inadequate, he was not deprived of the opportunity to do the research and meet with counsel and has not shown that he suffered any injury as a result of the time afforded him.

### b.    Telephone access to public defender

Plaintiff claims that after his four days in administrative segregation, he was unable to have access to his public defender because he failed to pay the $50 processing fee. Pretrial detainees "must be afforded reasonable access to telephones so as not to infringe the First Amendment or impede meaningful access to the courts in violation of the Fourteenth Amendment." Richardson v. Morris Cnty. Corr. Facility, Civ. A. No. 06-2340, 2006 WL 3000234, at *4 (D.N.J. Oct. 20, 2006). This right of access to the courts is an aspect of the First

32

Amendment right to petition the government for redress of grievances.  Id. at *5 (citing Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 741 (1983)).  In addition, due process of law under the Fourteenth Amendment requires that "prisoners be afforded access to the courts in order to challenge unlawful convictions and to seek redress for violations of their constitutional rights."  Id.  Moreover, under the Due Process Clause, restrictions on telephone access cannot be punitive when applied to pretrial detainees.  Fuentes v. N.J. Office of the Pub. Defenders, No. Civ. A. 05-3446, 2006 WL 83108, at *8 (D.N.J. Jan. 11, 2006).  Allegations of denial of telephone communication with counsel suggest a "denial of access to the courts and interference with the Sixth Amendment right to counsel."  Richardson, 2006 WL 3000234, at *5.

These constitutional protections, however, have limits.  "[P]risoners have no right to unlimited telephone use, and reasonable restrictions on telephone privileges do not violate their First Amendment rights."  Almahdi v. Ashcroft, 310 F. App'x 519, 522 (3d Cir. 2009) (internal quotation marks omitted).  A pretrial detainee's right to telephone access is "subject to rational limitations in the face of legitimate security interests of the penal institution."  Id. (quoting Strandberg v. City of Helena, 791 F.2d 744, 747 (9th Cir. 1986)).  Thus, a pretrial detainee does not have unfettered telephone access, even to communicate with legal counsel.  Guido v. U.S. Marshals, Civ. A. No. 08-1096, 2008 WL 1902742, at *8 (D.N.J. April 28, 2008).

Furthermore, inmates do not have a constitutional right to any particular means of accessing the courts or counsel such as unlimited telephone use.  Aruano v. Main, Civ. No. 07-3867, 2010 WL 2710564, at *8 (D.N.J. July 7, 2010).  Thus, if an inmate has another method of communicating "freely and privately with counsel, it is less likely that the restrictions on telephone use will rise to the level of a constitutional violation."  Id.  Lastly, a pretrial detainee

alleging a violation of his right of access to the courts must show that prison officials caused him past or imminent "actual injury."  Lewis v. Casey, 518 U.S. 343, 348 (1996).

Here, Plaintiff alleges that he was unable to contact his attorney because was indigent and could not pay the required $50 processing fee. (See Doc. No. 11 at 9, 12-13.)  By implication, Plaintiff is challenging the constitutionality of the $50 processing fee.  Plaintiff's claims fail because (1) BCJS' processing fee was not unreasonable because he had other means of communicating with counsel and (2) Plaintiff did not suffer any actual injury as a result of the fee requirement.

First, the $50 processing fee did not unjustifiably obstruct Plaintiff's access to counsel. In his Complaint, Plaintiff asserts that he communicated with counsel through public defender communication forms on many occasions.  (See Doc. No. 11 at 9, 13, 31.)  He also explains that he had two video conferences with public defenders.  (Id. at 31, 41.)  Furthermore, on August, 13, 2014, BCJS staff changed the inmate telephone policy and set up a "special services menu" on the telephone system which allowed inmates to contact counsel by telephone despite nonpayment of the processing fee.

When balanced with the needs of prison administration and the fact that Plaintiff had access to his attorneys through other means of communication, the $50 fee was not unreasonable. See Bell, 441 U.S. at 547.  Moreover, courts have held that a $50 fee on inmate accounts to be a nominal surcharge not intended as punishment, and the imposition of the fee does not violate any due process rights of an inmate.  Fuentes, 2006 WL 83108, at *8; see also Aultman v. Comm. Educ. Ctrs. Inc., 606 F. App'x 665, 665 (3d Cir. 2015) (characterizing the processing fee that is assessed against all inmates upon arrival as a "routine matter of accounting").

Finally, Plaintiff has not alleged in his Complaint any actual injury suffered from the inability to contact his attorney by phone.  Plaintiff claims this impacted his ability to pursue a defense for his preliminary hearing.  (Doc. No. 52 at 8.)  This general allegation, without more, does not constitute actual injury.  As discussed above, Plaintiff was able to meet with counsel before the preliminary hearing.   The fact that he was dissatisfied with the strategy pursued at the hearing and that he remained incarcerated does not mean that he suffered an actual injury caused by the conduct of prison officials in limiting phone access as a result of nonpayment of the fee. Compare Henry v. Moore, 500 F. App'x 115, 117-18 (3d Cir. 2012) (finding that inability to obtain an attorney or present sufficient evidence for a preliminary hearing did not constitute actual injury in plaintiff's circumstances because plaintiff would have remained incarcerated despite the outcome of the preliminary hearing).

For all these reasons, Plaintiff's claim that he was prevented from contacting his attorney by telephone does not constitute a violation of the First, Sixth, and Fourteenth Amendments and will be dismissed.

### 2.    Interference with access to legal materials and research time

Plaintiff also alleges that BCJS violated his right to meaningful access to the courts under the Fourteenth Amendment because he was denied adequate access to the law library.  Over the course of two and a half days, Plaintiff asserts that he was given research time "amounting to only five hours."  (Doc. No. 11 at 12 ¶ 33.)  Additionally, for three days he did not have access to Third Circuit decisions before the problem was remedied.  (Id. at Ex. C-1L.)

There is no abstract, freestanding right to a law library or legal assistance.  Lewis, 518 U.S. at 351.  Thus, "an inmate cannot establish relevant actual injury simply by establishing that the prison's law library or legal system is subpar in some theoretical sense.  Id.  An inmate must

go "further and demonstrate that the alleged shortcomings in the library . . .  hindered his effort to pursue a legal claim." Id.

In Tinsley v. Giorla, the Third Circuit affirmed the district court's grant of defendants' motion for summary judgment concluding that plaintiff was given adequate access to the law library. 369 F. App'x at 380-81.  It was unclear how many hours the plaintiff was able to access the law library, but he asserted that he should have been given daily access totaling at least fifteen to twenty hours per week.  Id. at 379-80.  The plaintiff in Tinsley could not "point to any specific deadline missed or any prejudice that he suffered as a result of the prison official's alleged actions." Id. at 381.

In the instant case, Plaintiff has merely alleged that his research time over two and a half days amounted to five hours and that he could not access Third Circuit case law for three days. Plaintiff has failed to show how five hours of research time over two and a half days is not adequate access to the law library.  See Williams v. Frame, 821 F. Supp. 1093, 1100 (E.D. Pa. 1993) (concluding that plaintiff failed to demonstrate that seven hours per week in the law library was not adequate).  Further, Plaintiff baldly asserts that his lack of access to Third Circuit case law "hinder[ed] him."  (Doc. No. 11 at 17 ¶ 57.)  However, at no point does Plaintiff explain exactly how he was hindered.  Even liberally construing Plaintiff's Complaint, Plaintiff has not alleged any actual injury suffered.  For these reasons, Plaintiff's Fourteenth Amendment claims against BCJS for inadequate access to the law library and Third Circuit case law are without merit and will be dismissed.

### 3.    Failure to provide a separate box for public defender forms or have Plaintiff sign a confidentiality form

Plaintiff asserts that BCJS and Lieutenant Miguel Castro violated Plaintiff's First and Fourteenth Amendment rights by failing to provide a box separate from other mail in which

inmates could place outgoing public defender forms, and by failing to have Plaintiff sign a confidentiality form.

### a.       Separate box for public defender forms

Interspersed in Counts V, VI, IX, X, XI, Plaintiff alleges that BCJS and various members of BCJS staff violated his First and Fourteenth Amendment rights by failing to provide a separate box for outgoing public defender communication forms.   (Doc. No. 11 at Ex. C-1K, C-1Q.) Plaintiff takes issue with the fact that the public defender form is placed in the same box as other outgoing mail despite its sensitive subject matter.   He also claims that this commingling of mail allows prison staff to read his mail intended for counsel in violation of his attorney-client privilege.

Plaintiff fails to establish how the mixing of legal and non-legal mail in the same outgoing mailbox is a constitutional violation, nor has he cited to any case law that establishes the same as a violation.   In fact, courts have found that a more intrusive handling of legal mail by prison staff does not amount to a constitutional violation.   For example, prison staff reviewing mail sent to a judge did not violate the constituion.   See Simcox v. Del. Cnty., No. 91-6874, 1992 WL 97896, at *3 (E.D. Pa. May 5, 1992) (citing Bryan v. Werner, 516 F.2d 233, 239 (3d Cir. 1975)) ("Absent an outright refusal to mail correspondence intended for the courts or some other improper purpose, prison officials may review outgoing legal mail.")

Even so, Plaintiff has not set forth any facts to support an allegation that outgoing legal mail was reviewed by prison staff.   He merely alleges that he believes a lack of separate box interferes with attorney-client privilege.   (Doc. No. 11 at Ex.C-1K.)   He does not show how this situation caused him any actual injury.   See Demeter v. Buskirk, No. 03-0790, 2003 WL 22416045, at *8 (E.D. Pa. Oct. 20, 2013) (concluding that personal speculation as to interception

of outgoing legal mail does not state a claim for relief under Section 1983).   Therefore, Plaintiff's claims fail and will be dismissed.

### b.        Failure to sign a confidentiality form

Plaintiff also alleges that he did not sign a confidentiality form to prevent his personal information from being shared and to permit prison staff to handle his public defender forms. (Doc. No. 11 at Ex. C-1AC.)  Plaintiff attached to the Complaint the inmate grievance he filed regarding the need for inmates to sign a "confidentiality form."  The grievance reads:

> With this being a 'Privately'[23] run prison can someone please explain to me why I have not been given any type of confidentiality form to sign that guarantees that my personal information, medical information, account information, and an informational clause [sic] between treatment staff and inmates that assures me that none of my information is being broadcast publicly.  Also, I have not signed any type of Confidentality Clause with the BCJS treatment staff relinquishing my Attorney-Client privilege rights to allow treatment staff to handle my attorney-client communications (Public Defender Form). [sic]  I do have a right to privacy especially with my personal information, medical and legal.  So where is my copy of a confidentiality agreement. [sic]

(Id. at Ex. C1AC.)[24]

---

[23] BCJS is not a privately-run prison.  Rather, it is a local government agency.  See Cnty. of Berks, Pa., Welcome to the Berks County Jail System, http://www.co.berks.pa.us/Dept/Jail/Pages/HomePage.aspx (last visited Aug. 18, 2015).

[24] Lieutenant Castro responded to this grievance as follows:

> This is not a privately run facility.  As a local government agency, we afford you your rights under HIPPA and your right to confidential communication between you and your attorney and you and the courts.  If you wish to ask individual departments within the jail about confidentiality clauses, use an inmate communication form properly addressed to the correct department.  You have no constitutional right to a confidentiality form and there is no policy at this facility indicating that you must receive a confidentiality form, and you've made no detailed allegation of any violations of confidentiality.  Therefore, your complaint fails to meet even the most basic requirements for consideration as a grievable issue.

(Doc. No. 11 at Ex. C-1AC.)

The Third Circuit recognizes a fundamental right to privacy in medical information.  Doe v. Delie, 257 F.3d 309, 316-17 (3d Cir. 2001).  This constitutional right is "subject to substantial restrictions and limitations in order for correctional officers to achieve legitimate correctional goals and maintain institutional security."  Id. at 317.  "[A]n inmate's constitutional right may be curtailed by a policy or regulation that is shown to be 'reasonably related to legitimate penological interests.'"  Id. (quoting Turner v. Safely, 482 U.S. 78, 89 (1987)).

Plaintiff does not allege that BCJS has not honored his right to privacy with respect to medical records or misused personal information on his public defender form.  He simply alleges in his Complaint that he feels he should have signed a confidentiality form as a means to prevent misuse.  (Doc. No. 11 at Ex. C-1AC.)  This allegation fails to rise to the level of liability under Section 1983 because he has not alleged any particular conduct that has violated any kind of confidentiality.  Compare Iseley v. Dragovich, 236 F. Supp. 2d 472, 473-74 (E.D. Pa. 2002) (explaining that the signing of consent forms was to authorize release of personal information rather than to prevent it).  Thus, Plaintiff's claim will be dismissed.

### D.    Section 1983 Claim Against BCJS and Berks County Public Defenders for Conspiring to Violate Plaintiff's Constitutional Rights

In Count XII, Plaintiff alleges that BCJS and Berks County Public Defenders conspired to violate his constitutional rights by failing to provide a separate box from other non-legal mail for outgoing public defender forms.  "In order to prevail on a conspiracy claim under Section 1983, a plaintiff must prove that persons acting under color of state law conspired to deprive him of a federally protected right."  Watson v. Sec'y Pa. Dept. of Corr., 436 F. App'x 131, 137 (3d Cir. 2011) (internal quotation marks omitted).  A plaintiff must plead an actual agreement between the parties.  Id.  Because the "linchpin for conspiracy is agreement, concerted action without more cannot suffice to state a conspiracy claim."  Id.  Further, "a private person alleged

to have conspired with an immune state official cannot be held liable, since he is conspiring with someone against whom a valid claim could not be stated." Boyer v. Mohring, 994 F. Supp. 2d 649, 659 (E.D. Pa. 2014) (citing Waits v. McGowan, 516 F.2d 203 (3d Cir. 1975)).

Preliminarily, as discussed below, public defenders are immune from Section 1983 liability. Thus, neither defendant can be held liable for the alleged conspiracy. Even if public defenders were not immune, Plaintiff's claim would still fail because he has not set forth any facts to support the assertion that there was any agreement between BCJS and Berks County Public Defenders to deprive him of a constitutional right. See Schlager v. Beard, 398 F. App'x 699, 702 (3d Cir. 2010) (dismissing plaintiff's complaint alleging a conspiracy among prison officials to deprive him of document and reasoning that if there was no violation of rights, there can be no conspiracy claim). For all these reasons, Plaintiff's conspiracy claim against BCJS and Berks County Public Defenders fails and will be dismissed.

### E.      Section 1983 Claim Against BCJS for Tampering with Non-Legal Mail

Although not enumerated in a specific Count, interspersed throughout the Complaint are claims against BCJS and BCJS staff for tampering with his non-legal outgoing mail and for the attitude of a staff member allegedly exhibited in meetings with Plaintiff. Plaintiff alleges that he sent a letter to his mother with a mold sample, and that his mother did not receive the sample. (Doc. No. 11 at 41 ¶¶ 73, 80.) He believes that the prison staff tampered with his mail and removed the mold sample. (Id. at 41 ¶ 80, Ex. C-1AB.)

"The Supreme Court has recognized that prisoners have protected First Amendment interests in both sending and receiving mail." Caldwell v. Beard, 305 F. App'x 1, 4 (3d Cir. 2008). The Court further recognized that the rights of prisoners "must be exercised with due regard for the inordinately difficult undertaking that is modern prison administration." Id. (internal quotation marks omitted). The opening and inspecting of outgoing personal mail is

reasonably related to the legitimate penological interest of institutional security.  Id.  Despite the right to send and receive mail, the opening and inspecting of outgoing mail, especially mail containing a sample of mold, is reasonably related to the legitimate penological interest of BCJS security.  Thus, Plaintiff's First Amendment claim for BCJS tampering with his non-legal mail will be dismissed.

Moreover, Plaintiff alleges that Lieutenant Jennifer Sharp's aggressive attitude while meeting with Plaintiff violated his Fourteenth Amendment rights.  (Doc. No. 11 at Ex. C-1AG.)  Verbal abuse alone of a prisoner by a correctional officer is not actionable under Section 1983.  Aleem-X v. Westcott, 347 F. App'x 731, 731 (3d Cir. 2009).  Even if Lieutenant Sharp's words amounted to abuse, which Plaintiff does not allege, this would not raise to the level of liability under § 1983.  For this reason, Plaintiff's claim will be dismissed.

## F.    Other Claims Against Berks County Public Defender's Office and its Employees

Finally, in Counts XIII through XVII, Plaintiff asserts claims against the Berks County Public Defender's Office, Berks County Chief Public Defender Glenn D. Welsh, Assistant Public Defenders Roarke T. Aston, Paul Yessler, and Investigator William Hanebury for ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments.  Plaintiff's claims fail because public defenders are not state actors, and thus are not subject to liability under Section 1983.

To state a claim under 42 U.S.C. § 1983, Plaintiff must show: "(1) that the conduct complained of was committed by a person acting under the color of state law; and (2) that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States."  Repoli v. Cuoco, 316 F. App'x 188, 190 (3d Cir. 2009).  "Under color of state law" has been interpreted by the Supreme Court to require a defendant in a Section

1983 suit to be a state actor.  Lugar v. Edmonson Oil Co., 457 U.S. 922 (1982).  Although public defenders are employed by the state, they are not state actors because they are independent and free of state control, and are loyal to the criminal defendant.  Polk Cnty. v. Dodson, 454 U.S. 312, 330 (1981).  Thus, public defenders are absolutely immune from liability under Section 1983.  Clark v. Vernon, 228 F. App'x 128, 133 (3d Cir. 2007).  Additionally, an "investigator employed by a public defender is absolutely immune for his investigative assistance in the course of a criminal defense."  Id. at 131.

Because Berks County Public Defenders do not qualify as state actors, they are immune from suit under Section 1983.  As an investigator employed by Berks County Public Defenders, William Hanebury is also immune for his investigative assistance in the course of Plaintiff's criminal defense.  Therefore, Plaintiff's Sixth and Fourteenth Amendment claims against Public Defenders Glenn D. Welsh, Roarke T. Aston, and Paul Yessler and Investigator William Hanebury will be dismissed.

## V.      CONCLUSION

For all the foregoing reasons, Defendants' Motions to Dismiss (Doc. Nos. 44, 45) will be granted and Plaintiff's Complaint (Doc. No. 11) will be dismissed in its entirety.[25]   An appropriate order follows.[26]

---

[25] "The Third Circuit has held that a Plaintiff whose Complaint fails to state a cognizable claim is entitled to amend his pleading unless the Court finds bad faith, undue delay, prejudice, or futility."  Williams v. Bickell, Civ. A. No. 3:CV-12-1523, 2012 WL 5379171, at *5 (M.D. Pa. Aug. 17, 2012).  Here, the Court will not grant leave to amend.  Amendment would be futile because at least one or more required elements of each claim is not curable.  Further, on February 17, 2015, at the hearing on all outstanding Motions, Plaintiff had the opportunity to elaborate and discuss all claims.  During this hearing, Plaintiff did not advance any additional facts that would plausibly support a constitutional violation.  (See Doc. No. 56.)  The Court is convinced that no additional facts could plausibly cure the defects in the allegations.

[26] Since the date of the February 17, 2015 hearing on the Motions, Defendant has filed several handwritten documents with the docket number of this case.  (Doc. Nos. 55, 62, 63, 64, 65,

66, 67, 68.)  Document number 55 is a Motion for Summary Judgment, which states that Plaintiff is back in the custody of BCJS after being arrested on new and unrelated criminal charges.  (Doc. No. 55 at 2.)  Plaintiff's Motion for Summary Judgment is premature and without merit and will be denied.  Document number 62 is a letter from Plaintiff to the Clerk of Court.  In the letter, Plaintiff notifies the Court that he was transferred from the Berks County Jail to the Bucks County Correctional Facility and then to the Franklin County Jail. The letter contains additional complaints regarding the conditions of his confinement in these facilities.  Document number 63 is a "declaration" from Plaintiff from the Franklin County Jail which also details numerous complaints about the conditions of his confinement. Document number 64 is an amended notice of change of address and a request for documents which Plaintiff already had, but apparently misplaced, either due to the change in the facility where he is incarcerated or for other reasons.  Document number 65 is another "declaration" regarding, among other things, complaints about his incarceration in the Franklin County Jail. Document number 66 is another "declaration" in which Plaintiff again complains about his treatment at the Franklin County Jail.  Document numbers 67 and 68 is a "request for a New Action or Joinder" in which Plaintiff advances new claims against Defendants named in the instant case and against new Defendants.

Even if the Court had permitted one or more of these documents to be filed as a new Complaint, they would be dismissed for either nonpayment of the filing fee or failure to file a petition seeking in forma pauperis status under 28 U.S.C. § 1915(a)(1)-(2).  Moreover, the claims asserted would be dismissed because they simply express his dissatisfaction with the conditions of his confinement and are set forth in a handwritten hodgepodge manner that either fails to state a claim or is frivolous.  28 U.S.C. § 1915(e)(2)(B)(i)-(ii).